**Frederick Dennis GREENE, Plaintiff,**

v.

**SHA–NA–NA, a partnership, An Evening With Sha-Na-Na, a partnership, Leonard J. Baker, Scott J. Simon, Donald W. York and John F. Marcellino, Defendants.**

Civ. A. No. N–84–628 (RCZ).

United States District Court,
D. Connecticut.

May 23, 1986.

William R. Murphy, Leonard C. Boyle, Tyler Cooper & Alcorn, New Haven, Conn., Philip R. Hoffman, Pryor, Cashman, Sherman & Flynn, New York City, for plaintiff.

William H. Clendenen, Jr., David M. Lesser, Clendenen & Lesser, New Haven, Conn., Lee Calligaro, Casson, Calligaro & Mutryn, Washington, D.C., for defendants.

### RULING ON DEFENDANTS' MOTION TO DISMISS

ZAMPANO, Senior District Judge.

The plaintiff, Frederick Dennis Greene, also known as Denny Greene and formerly a member of the rock and roll band and partnership known as "Sha-Na-Na," instituted this suit for injunctive, monetary, and other relief against four of his former partners in "Sha-Na-Na": Leonard J. Baker, Scott J. Simon, Donald W. York, and John F. Marcellino (collectively referred to as the "individual defendants"). This suit arises from Greene's expulsion from and

the dissolution of the "Sha-Na-Na" partnership and another partnership, "An Evening With Sha-Na-Na," by the individual defendants, and their subsequent formation of two new partnerships under the same names. The new partnerships are also defendants in this suit.

Pending is the defendants' motion to dismiss for lack of *in personam* jurisdiction and improper venue pursuant to Fed.R. Civ.P. 12(b)(2) and (3). Three of the individual defendants are citizens of California and one is a citizen of Massachusetts, while the plaintiff is a citizen of Connecticut. The partnership defendants were formed under the laws of California. The complaint alleges both diversity and federal question subject matter jurisdiction.

In addition to the pleadings, the record before the Court on defendants' motion to dismiss consists of memoranda and supporting affidavits, as well as answers to interrogatories and documents exchanged by the parties after the Court, at oral argument, authorized jurisdictional discovery.

### FACTS

The record reveals that in 1969, the plaintiff, along with defendants York and Marcellino and various other individuals, formed a rock and roll band and entered into an oral agreement in New York to form the "Sha-Na-Na" partnership (hereinafter referred to as "the Original Sha-Na-Na"). Defendants Baker and Simon joined the band and partnership in 1970.

Between 1969 and October 1984, the Original Sha-Na-Na, specializing in music of the 1950's, performed at numerous concerts, recorded several albums, appeared in motion pictures and on TV variety shows, and had their own syndicated TV series.

In 1978, after application to the United States Patent and Trademark Office, the service mark "Sha-Na-Na" was registered (No. 1,094,764) in the names of the plaintiff and the individual defendants as joint owners for "musical entertainment services rendered by a group." In 1981, the group entered into an oral agreement whereby a second partnership known as "An Evening With Sha-Na-Na" (hereinafter referred to as "the Original An Evening With Sha-Na-Na") was formed.[1]

The plaintiff contends that at or about the time of a performance at the Woodstock Music and Performing Arts Festival in August 1969, the Original Sha-Na-Na agreed that, in view of its rapidly growing reputation, all of its efforts would be concentrated upon performing only in concert settings in the top rated music halls, arenas, and auditoriums and only for amounts of money commensurate with their reputation.

Fifteen years later, in August 1984, the Original Sha-Na-Na received an offer to perform for one week in August at the Sands Hotel in Las Vegas, Nevada for compensation representing approximately ten percent of the amount the band customarily received for such performances. Despite the lower than usual compensation, the Original Sha-Na-Na agreed to perform at the Sands Hotel as a "showcase" to promote further bookings at amounts commensurate with its usual compensation. However, the plaintiff claims that, at the same time, the Original Sha-Na-Na reaffirmed its agreement of 1969 that, after this "showcase", it would continue to concentrate its efforts on performing only in top-rated settings for money befitting its reputation.

In October 1984, without consulting the plaintiff, the individual defendants entered into another agreement to perform at the Sands Hotel over a two-week period beginning on October 16, 1984, for a small fraction of the Original Sha-Na-Na's usual compensation. At a meeting of the partner-

---

**1.** While the membership of the original partnerships changed at various times over the years following their formation, for purposes of the pending motion it is sufficient to note that in October 1984, the only remaining members of the original partnerships were the plaintiff and the individual defendants. Likewise, while others had participated as joint owners when the Sha-Na-Na service mark was first registered, by October 1984, the plaintiff and the individual defendants were the sole, joint owners of the service mark.

ships in Las Vegas on October 11, 1984, the plaintiff informed the individual defendants that the second booking at the Sands Hotel was a violation of the original partnership's agreement and practice over the years to perform only for much higher rates of compensation. The individual defendants responded that they would perform at the Sands Hotel beginning on October 16, 1984, with or without his consent or participation. Moreover, they informed the plaintiff that they had also entered into agreements to perform in New Orleans, Louisiana for two weeks in late December, and in Dallas, Texas for two weeks in January 1985, for less than the band's usual pay, and that they would go forward with these performances with or without his consent.

On October 15, 1984, the individual defendants telephoned the plaintiff in Connecticut and told him that if he did not perform at the Sands Hotel in Las Vegas on October 17, 1984, he would be expelled from the original partnerships. The next day, a telegram confirming the message was sent to the plaintiff in Connecticut. That same day the plaintiff responded with his own telegram, informing the individual defendants that he would not appear at the Sands Hotel engagement, that he was not withdrawing as a partner, and that he would be available for concerts subsequent to the Sands Hotel performance. Nonetheless, by a letter dated October 22, 1984, the individual defendants informed the plaintiff that on October 17, 1984, they had filed a notice of dissolution of the Original Sha-Na-Na and the Original An Evening with Sha-Na-Na partnerships in California and had formed two new partnerships in California under the same names (hereinafter referred to as "the New Sha-Na-Na" and "the New An Evening With Sha-Na-Na"). This lawsuit followed.

In effect the plaintiff contends that, since October 1984, the defendants have been unlawfully using the registered service mark "Sha-Na-Na" and wrongfully holding themselves out as the Original Sha-Na-Na. He seeks injunctive relief and compensatory damages based on breach of contract, wrongful dissolution of the original partnerships, statutory and common law service mark infringement, unfair competition, and misappropriation of property.

Subsequent to the commencement of the instant action, the New York Post, a newspaper sold in Connecticut, featured an advertisement stating that Sha-Na-Na would be appearing at Grossinger's in upstate New York on December 27, 1984. Above the name Sha-Na-Na was a picture of the Original Sha-Na-Na, including the plaintiff. In addition, on January 13, 1985, defendants appeared as the Sha-Na-Na on nationwide television as part of the "Weekend With the Stars Telethon for Cerebral Palsy." The program, which originated in California, was telecast over one Connecticut television station, Channel 30, WVIT, the NBC affiliate in Hartford, and was cablecast throughout the country and in Connecticut on Superstation WOR.

## DISCUSSION

### A. Personal Jurisdiction

The plaintiff attempts to sustain his burden of establishing that the defendants are subject to the personal jurisdiction of this Court, *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2 Cir.1985), by reference to three provisions of the Connecticut "long-arm" statute governing personal jurisdiction over nonresident individuals and foreign partnerships. Conn.Gen. Stat. § 52–59b.[2] In diversity and federal

---

**2.** Conn.Gen.Stat. § 52–59b states in relevant part:

    (a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual, or foreign partnership, ... who in person or through an agent:

    (1) Transacts any business within the state; or

    (2) commits a tortious act within the state ...; or

    (3) commits a tortious act outside the state causing injury to person or property within the state, ... if he

    (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from

question lawsuits, before a federal court can properly assert personal jurisdiction over such defendants, it must make two inquiries. First, it must determine whether the state's long-arm statute authorizes the exercise of jurisdiction. *See United States v. First National City Bank*, 379 U.S. 378, 381, 85 S.Ct. 528, 530, 13 L.Ed.2d 365 (1965); *Arrowsmith v. United Press International*, 320 F.2d 219, 223 (2 Cir.1963) (en banc); *Bross Utilities Service Corp. v. Aboubshait*, 489 F.Supp. 1366, 1370 (D.Conn.), *aff'd mem.*, 646 F.2d 559 (2 Cir. 1980); *Lombard Bros. v. General Assessment Management Co.*, 190 Conn. 245, 250, 460 A.2d 481 (1983). Second, the court must decide whether the statutory authority comports with due process. *See, e.g., International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), and its progeny.

*Section 52–59b(a)(1)*

Section 52–59b(a)(1) of Connecticut's long-arm statute extends jurisdiction over nonresidents and foreign partnerships if they "transact any business" within Connecticut and if the present cause of action arises from the transaction of such business. Plaintiff argues that his causes of action for service mark infringement and unfair competition arise from the defendants' transaction of business in Connecticut in the form of "solicitation" through the December 21, 1984 ad in the New York Post advertising their appearance at Grossinger's, and through their January 15, 1985 nationwide telethon appearance.[3]

█ It is well established that jurisdiction is to be determined by examining the conduct of the defendants as of the time of service of the complaint, *Connecticut Artcraft Corp. v. Smith*, 574 F.Supp. 626, 630 (D.Conn.1983) (citing *Lachman v. Bank of Louisiana in New Orleans*, 510 F.Supp. 753, 757 (N.D.Ohio 1981)), which in this case occurred on November 29, 1984. As such, the plaintiff's causes of action cannot be said to have arisen from either the December 21, 1984 New York Post ad or the January 15, 1985 telethon appearance, and these activities cannot form the basis of this Court's jurisdiction.

█ Even if the timing of these occurrences did not defeat the plaintiff's arguments, neither the New York Post ad nor the nationwide telethon broadcast constitutes the type of "single purposeful business transaction" required to satisfy Sec-

---

goods used or consumed or services rendered, in the state, or
(B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce....

**3.** The plaintiff also points out that, as members of the Original Sha-Na-Na, the individual defendants transacted business in Connecticut between 1969 and October 1984. In this regard, the plaintiff cites the Original Sha-Na-Na's appearances on television programs which were televised nationwide and in Connecticut, but which did not originate in Connecticut; the group's appearances in three motion pictures which were shown in theaters in Connecticut; and the sale of the Original Sha-Na-Na's records and other merchandise in Connecticut.

Additionally, the Original Sha-Na-Na performed twenty times in Connecticut over the fifteen years from 1969 through 1984; the most recent performance being on February 14, 1984. The Original Sha-Na-Na's merchandise, including T-shirts and record albums, was sold at these various performances, and a set of 1980 performances in Wallingford were recorded for a live album.

Finally, according to the plaintiff's interpretation of the economic data produced by the individual defendants for the ten year period from 1974 through 1984, the Original Sha-Na-Na earned $421,765.58 from its activities in Connecticut from 1977 through 1984. The individual defendants take the position that the Original Sha-Na-Na's gross earnings in Connecticut from 1974 through 1984 were insignificant and constituted, on average, only 2.85 percent of the group's total gross earnings.

Clearly, any activities by the Original Sha-Na-Na in Connecticut between 1969 and October 1984 are not relevant to Section 52–59b(a)(1) jurisdiction, since the plaintiff was a member of the group during that period and his present causes of action do not arise from those activities. *Cf. Shick v. TSR, Inc.*, Civil No. H–84–975 (MJB), slip op. at 4–6 (D.Conn. March 7, 1985) (motion to dismiss under Section 33–411(b) of Connecticut's corporate long-arm statute granted in suit for breach of employment agreement because suit did not arise out of the business defendant employer transacted in Connecticut).

tion 52–59b(a)(1). *Zartolas v. Nisenfeld,* 184 Conn. 471, 474, 440 A.2d 179 (1981).

For example, under analogous facts in *Lombard Bros. v. General Asset Management Co.,* 190 Conn. 245, 255–57, 460 A.2d 481 (1983), the Connecticut Supreme Court declined to find repeated solicitation of business under Connecticut's corporate long-arm statute, Section 33–411(c)(2), where a defendant's general advertisements in this state were limited to two notices in the New York Times and the Wall Street Journal announcing the names of persons joining the firm. As with *Lombard,* the peripheral newspaper ad in the present case makes it factually distinguishable from a genuine solicitation case such as *McFaddin v. National Executive Search, Inc.,* 354 F.Supp. 1166, 1168–70 (D.Conn.1973).

The Court additionally notes that the individual defendants' October 15, 1984 telephone call, October 16, 1984 telegram, and October 22, 1984 letter, all directed to the plaintiff in Connecticut, are insufficient to constitute the transacting of business in Connecticut. *See, e.g., Agrashell, Inc. v. Bernard Sirotta Co.,* 344 F.2d 583, 587–88 (2 Cir.1965) (construing a nearly identical statute, N.Y.C.P.L.R. 302(a)(1)); *Connecticut Artcraft Corp.,* 574 F.Supp. at 631, and cases cited therein; *Bross Utilities Service Corp.,* 489 F.Supp. at 1371–72, and cases cited therein.

Accordingly, jurisdiction may not be exercised under Section 52–59b(a)(1).

*Section 52–59b(a)(2)*

The plaintiff next asserts that jurisdiction exists under Section 52–59b(a)(2) because the defendants committed tortious acts within Connecticut out of which this suit arises: specifically, service mark infringement and unfair competition. The plaintiff points to the December 21, 1984 New York Post ad and the January 15, 1985 nationwide telethon appearance, in support of his argument that the defendants have been passing themselves off as the Original Sha-Na-Na in Connecticut.

These post-service occurrences are not sufficient to support the exercise of jurisdiction, *see Connecticut Artcraft Corp.,* 574 F.Supp. at 630, as the present suit cannot be said to have arisen from them.[4]

Even if the New York Post ad and telethon appearance had occurred prior to service of the complaint, it is unlikely that they would constitute tortious acts committed within Connecticut. These occurrences are qualitatively different from the direct "passing-off"[5] in the forum state engaged in by the defendants in *Transamerica Corp. v. Transfer Planning, Inc.,* 419 F.Supp. 1261 (S.D.N.Y.1976) and *Metropa Co. v. Choi,* 458 F.Supp. 1052 (S.D.N.Y. 1978), two cases relied on by the plaintiff.

In *Transamerica Corp.,* a trademark infringement action, the court found jurisdic-

---

**4.** Another *post-service* occurrence cited by the plaintiff, a discussion that International Creative Management, the defendants' agent, may have had with a promoter regarding the possibility of an appearance by the "New Sha-Na-Na" in Wallingford during the summer of 1985, also does not support a finding of jurisdiction because the present suit cannot be said to have arisen from it. The Court notes, parenthetically, that no contract for such a performance was ever consummated, and that there is no evidence as to where the single discussion by International Creative Management may have taken place.

**5.** In *Marvel Products, Inc. v. Fantastics, Inc.,* 296 F.Supp. 783 (D.Conn.1968), an unfair competition action, Judge Blumenfeld quoting from the Second Circuit stated that "'the wrong takes place ... where the passing off occurs, *i.e.,*

where the deceived customer buys the defendant's product in the belief that he is buying the plaintiff's,'" and concluded that the basis for determining the place of the wrongful conduct comes down to the question: Where were the wrongful acts performed? *Id.* at 787 (quoting *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 639 (2 Cir.), *cert. denied,* 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956)).

On this basis, Judge Blumenfeld held that the defendant's sale of its product to retailers outside Connecticut did not satisfy Section 33–411(c)(4) of Connecticut's corporate long-arm statute, despite any subsequent resale by such retailers in Connecticut, and that therefore personal jurisdiction did not exist. Like Section 52–59b(a)(2), the corporate long-arm statute extends jurisdiction over a foreign corporation where the cause of action arises out of that corporation's tortious conduct in this state.

tion under N.Y.C.P.L.R. 302(a)(2), Section 52–59b(a)(2)'s New York counterpart. There, however, the defendant had not only placed an advertisement in the Wall Street Journal and two European newspapers available in New York, but also had conducted a direct mailing campaign within New York of 100 to 250 brochures containing symbols which allegedly infringed the plaintiff's registered trademark. Similarly, in *Metropa,* the court found personal jurisdiction under N.Y.C.P.L.R. 302(a)(2) in a trademark infringement and unfair competition action where the defendant had passed off its allegedly infringing product in New York through a direct mail order sale.

Here, however, the defendants performed no wrongful acts in Connecticut in relation to the New York Post ad and the telethon appearance. If the defendants or their agents obtained the booking for the December 1984 appearance at Grossinger's in upstate New York by passing themselves off as the Original Sha-Na-Na, the wrongful acts were performed in New York where it appears that the booking was negotiated and consummated. Moreover, the record reveals that the ad for the appearance at Grossinger's was placed in the New York Post by the promoter of the event, not by defendants or their agents in Connecticut. As such, the ad's connection with Connecticut is too tenuous to support jurisdiction. *See Herman Miller, Inc. v. Mr. Rents, Inc.,* 545 F.Supp. 1241 (W.D. Mich.1982).[6]

Similarly, any wrongful acts performed by defendants or their agents in relation to the charity telethon appearance, by passing themselves off as the Original Sha-Na-Na, were performed in California, the state where the defendants were contacted by a telethon representative and orally agreed to appear and the state from which the program was transmitted.

Jurisdiction, therefore, is not proper under Section 52–59b(a)(2).[7]

*Section 52–59b(a)(3)*

A more difficult question is presented by the plaintiff's invocation of Conn.Gen.Stat. § 52–59b(a)(3), which confers jurisdiction over defendants who, among other things, commit a tortious act outside of Connecticut which causes injury in the state. As the Court's discussion of the facts indicates, the tortious conduct alleged was committed outside Connecticut. Therefore, the threshold question under Section 52–59b(a)(3) is whether any injury to the plaintiff occurred in Connecticut.

Courts in this District have adopted the "critical events" test to determine the situs of the injury resulting from a commercial tort.[8] *See Connecticut Artcraft Corp.,* 574 F.Supp. at 629–30; *Bross Utilities Service Corp.,* 489 F.Supp. at 1374–75. Moreover, in evaluating the "critical events" for the purposes of jurisdiction, the plaintiff's residence or domicile within a state, in and of itself, is not a sufficient predicate for the exercise of jurisdiction. Rather, the determinative factor is evidence of direct economic injury to the plaintiff within the state. *See Connecticut Artcraft Corp.,* 574 F.Supp. at 629–30, and cases cited therein.

The plaintiff asks this Court to find that his injury occurred in Connecticut because,

---

**6.** *Buckley v. New York Post Corp.,* 373 F.2d 175 (2 Cir.1967), a libel suit where Judge Friendly, noting the volume of the New York Post's distribution in Connecticut, found that jurisdiction over the newspaper was proper, does not support a finding that jurisdiction is also proper over the subjects of an ad that appears in that newspaper and that was placed by a third party.

**7.** Even if the newspaper ad and telethon telecast could be said to satisfy Section 52–59b(a)(2), they do not constitute sufficient contacts between the defendants and Connecticut so that maintenance of the suit here would not offend

" 'traditional notions of fair play and substantial justice.' " *Shaffer v. Heitner,* 433 U.S. 186, 203, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)).

**8.** In adopting the critical events test, this District has drawn upon a substantial body of relevant case law decided under the nearly identical New York statute, N.Y.C.P.L.R. § 302(a), upon which Conn.Gen.Stat. § 52–59b(a) is based. *See Gandolfo v. Alford,* 31 Conn.Supp. 417, 424, 333 A.2d 65, 69 (Super.Ct.1975).

as a citizen of this state since 1978, it is here that he has felt the effects of the loss of income and purported damage to his reputation [9] occasioned by the defendants' allegedly tortious acts. However, the Court finds that these factors do not satisfy the "critical events" test.

Clearly, the "critical events" associated with the instant dispute—such as the dissolution of the Original Sha-Na-Na Partnerships, the formation of the new partnerships using the registered service mark "Sha-Na-Na," and the subsequent performances as the New Sha-Na-Na—took place outside Connecticut, notably in California and Nevada. Insofar as the record before this Court shows, the lost income which the plaintiff is suing to recover would have been derived solely from out-of-state performances. There is no evidence in the record that, at the time of service, the defendants had performed or negotiated any contracts in Connecticut or solicited any business here resulting in a loss of income to the plaintiff.

In short, while there is no question that the plaintiff suffered some harm in Connecticut, it is only in the sense that lost business anywhere in the United States indirectly would affect his income in Connecticut because he is domiciled here. As stated by the Second Circuit in reference to N.Y.C.P.L.R. § 302(a)(3), the statute " 'is not satisfied by remote or consequential injuries which occur in [the state] only because the plaintiff is domiciled, incorporated or doing business in the state.'" *American Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.* 439 F.2d 428, 433 (2 Cir.1971) (quoting *Friedr. Zoellner (New York) Corp. v. Tex Metals Co.,* 396 F.2d 300, 303 (2 Cir.1968)).

Also instructive is *Black v. Oberle Rentals, Inc.,* 55 Misc.2d 398, 285 N.Y.S.2d 226 (Sup.Ct.1967), one of the first New York cases to interpret N.Y.C.P.L.R. § 302 and a case cited by the Court of Appeals in both *American Eutectic* and *Friedr. Zoellner.* In *Oberle Rentals,* New York domiciled plaintiffs were involved in a collision in Massachusetts. Plaintiffs alleged that the injury to person or property in New York were "permanent visible injuries [and] permanent loss of income." The New York court held that such "injury" did not confer jurisdiction under N.Y.C.P.L.R. 302(a)(3):

> Certainly every person injured in an accident has resultant damage as well as the personal injury. He may suffer lost earnings, diminution of earning capacity, long periods of convalescence and all such attendant damages. Conceptually it is difficult for this Court to hold that a personal or property injury in another state by virtue of a tortious act committed in that state can be said to have suffered some injury within the state of New York simply because he is domiciled here. In other words, Section 302(a)(3) CPLR looks to the imparting of the original injury within the State of New York and not resultant damage, in order that jurisdiction might be effectuated. To hold otherwise would be to open a veritable Pandora's Box of litigation subjecting every prospective defendant involved in an accident with a New York domiciliary to defend actions brought against them in the State of New York. This is hardly the minimal contact with the State prerequisite to the exercise of its power over a prospective defendant.

*Id.* at 400, 285 N.Y.S.2d at 229 (citation omitted). *See also Stark Carpet Corp. v. M-Geough Robinson, Inc.,* 481 F.Supp. 499, 508 (S.D.N.Y.1980) (indicating that the reasoning of *Oberle Rentals* also applies in cases where the injury is commercial rather than physical).

■ In light of the above, this Court finds that the loss of income and damage to reputation in Connecticut asserted by the

---

9. The highly speculative nature of any damage in Connecticut to the plaintiff's reputation is revealed by the following statements from his affidavit: "As more and more people become aware that, according to defendants, I am no longer a member of Sha-Na-Na, my ability to earn or obtain money will further decrease. In addition, people are always asking me how the group is doing, and then are quite surprised to hear that I am no longer considered a member. My reputation is suffering as a result." Greene Affidavit ¶ 33.

plaintiff are too remote and speculative to support a finding of jurisdiction under Section 52–59b(a)(3).

*Constitutional Standards*

Even assuming that Connecticut's long-arm statute authorized the exercise of *in personam* jurisdiction in this case, it is doubtful that such jurisdiction would be constitutionally permissible under the "minimum contacts" test of *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny.

At the time of service of the complaint, the individual defendants had no contacts with Connecticut other than that, as members of the Original Sha-Na-Na, their record albums, video cassettes of two movies in which the group appeared, and possibly some T-shirts bearing the group's image, were available at stores in the state. There is no evidence in the record regarding the volume of sales of these items or the revenues derived from any sale of these items during the relevant period. There also is no evidence that the individual defendants or their agents either directly promoted the availability of the Original Sha-Na-Na's records, video cassettes, and T-shirts here, or "purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). On the contrary, defendants' interrogatory answers indicate that the Original Sha-Na-Na's record albums, for example, are produced and sold by independent firms which pay a royalty and other forms of compensation to the group.[10] Moreover, the partnership defendants had no contacts

whatsoever with Connecticut at the time of service.

Under these circumstances, it is clear that the defendants' conduct and connections with Connecticut at the time of service were not such that they should reasonably have anticipated being haled into court here. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980); *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

B. *Venue*

Having decided that the exercise of *in personam* jurisdiction over the defendants is not proper in this case, it is not necessary for the Court to pass on the issue of venue. However, because an analysis of the venue issue also supports the Court's dismissal of this action, the Court will address the issue.

■ Venue in the instant action is controlled by 28 U.S.C. § 1391(b), because the complaint alleges claims under federal trademark law in addition to state law claims. Section 1391(b) provides that

> A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or *in which the claim arose,* except as otherwise provided by law. (emphasis supplied).

Accordingly, because none of the defendants reside in Connecticut and because all defendants do not reside in any one district, venue is proper only where the claim arose.

---

**10.** Indeed, the analysis the plaintiff asks this Court to adopt would mean that every artist or group whose record albums line the shelves of stores in Connecticut would be subject to personal jurisdiction in Connecticut, without evidence that even a single album was sold and on causes of action wholly unrelated to such albums. The Court rejects plaintiff's reasoning. This case is easily distinguished from *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct.

1473, 79 L.Ed.2d 790 (1984), where the Supreme Court found that jurisdiction was proper over Hustler Magazine in New Hampshire because the publisher regularly circulated its magazine in that state (10,000 to 15,000 copies sold monthly) and because the suit in question was a libel suit arising from the very contents of the magazine.

■ The plaintiff cites the December 21, 1984 New York Post ad and the January 13, 1985 nationally televised telethon appearance in support of his position that his claims for service mark infringement and unfair competition arose in Connecticut because the defendants "passed themselves off" as the Original Sha-Na-Na here. *See Marvel Products*, 296 F.Supp. at 787.[11] However, because both the New York Post ad and the telethon appearance occurred after the filing of the complaint in this action, the plaintiff's reliance on these occurrences to support a finding that venue is proper in this District is misplaced. *See, e.g., Louwers v. Knight-Ridder Newspapers, Inc.*, 570 F.Supp. 1211, 1212 (E.D. Mich.1983) ("Venue is determined as of the date in which the action was filed."); *Technograph Printed Circuits, Ltd. v. Packard Bell Electronics Corp.*, 290 F.Supp. 308, 326 (C.D.Cal.1968) (venue determined as of time of filing of actions); *Proler Steel Corp. v. Luria Bros. & Co.*, 225 F.Supp. 412, 413 (S.D.Tex.1964) (venue determined by facts existing at time action is filed).

■ Even assuming that these post-filing occurrences could properly be considered on the venue question, they do not satisfy the "weight of the contacts" test, as discussed in *Honda Associates, Inc. v. Nozawa Trading, Inc.*, 374 F.Supp. 886 (S.D.N.Y.1974), for determining venue in infringement actions.

In *Honda*, Judge Conner found that, where the defendant's contacts with New York consisted of sending some twenty catalogs using the allegedly infringing trademark into the state over a five year period, and receiving three mail orders for allegedly infringing goods with a retail value of $37 over a four year period, plaintiff's claim for trademark infringement could not be said to have arisen in New York. The court stated

> It is obvious that the overwhelming "weight of contacts" is in California. That is not to say that in trademark cases the "weight of contacts" rule should be applied so literally as to exclude suit in any district other than the one where the greatest volume of infringing activity occurred, but only that the claim should not be deemed to have arisen in a district in which the defendant has had only miniscule contact, and that entirely by mail.
>
> ... the right given by Section 1391(b) to sue in any district "in which the claim arose" is not the right to sue where *any* part of the claim, however small, arose....

*Id.* at 892.

As established by numerous later decisions of the same court that decided *Honda*, *Honda* stands for the proposition that venue should be denied in infringement cases where *no substantial part* of the infringing action occurs within the confines of the judicial district in question. *See Metropa*, 458 F.Supp. at 1055 n. 14, and cases cited therein.[12]

Accordingly, the Court concludes that venue in the instant case does not properly lie in this District. The mere facts that a New York newspaper containing an ad placed by a promoter regarding an upcoming performance by the defendants in New York is sold in Connecticut, and that a telethon appearance in California is telecast in Connecticut, do not, without more, constitute substantial infringing activities in

---

**11.** Plaintiff does not refute defendants' contentions that while his claims for breach of partnership agreements and wrongful dissolution of partnerships may have arisen either in California or Nevada, it is absolutely clear from the facts alleged that they did not arise in Connecticut. Memorandum in Support of Defendants' Motion to Dismiss at 5.

**12.** While plaintiff quotes language from *Metropa* in an attempt to persuade this Court that *Metropa* interpreted *Honda* to require only more than "miniscule contact" by an allegedly infringing defendant with the forum district, Memorandum in Opposition to Defendants' Motion to Dismiss at 30, plaintiff failed to draw this Court's attention to a most important footnote to the quoted language. In footnote 14, the *Metropa* court clearly adopted the "no substantial part" test. 458 F.Supp. at 1055, n. 14.

Connecticut. A conclusion otherwise would mean that a substantial part of the plaintiff's claim arose in every state where the New York Post is sold or distributed and in every state where defendants' nationwide television appearance was received.[13] Such reasoning is rejected.

### CONCLUSION

Upon a careful review of the record in this case, the Court concludes, for all of the foregoing reasons, that it does not have personal jurisdiction over these defendants, and that venue is not properly placed in this District.

Accordingly, the defendants' motion to dismiss is granted.

SO ORDERED.

---

**13.** In contrast, a substantial part of plaintiff's claims for infringement and unfair competition undoubtedly can be said to have arisen in California, where defendants formed two new partnerships using the registered service mark Sha-Na-Na, and in other states such as Nevada, where the defendants subsequently performed as the Sha-Na-Na.