Gabriel LEVINE, Plaintiff,

v.

The FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for the Connecticut Bank and Trust Company, N.A., Advest, Inc., Charles Badain and Samuel Messina, Defendants.

The NEW CONNECTICUT BANK AND TRUST COMPANY, N.A., Counterclaim Plaintiff,

v.

Gabriel LEVINE, Counterclaim Defendant.

Civ. No. H–88–331 (TFGD).

United States District Court, D. Connecticut.

May 28, 1991.

Leon J. Greenspan, Greenspan, Jaffe &
Rosenblatt, White Plains, N.Y., for plain-
tiff.

Lewis B. Rome and A. Paul Spinella, Rome, Case, Kennelly & Klebanoff, Bloomfield, Conn., for FDIC and New CBT.

David Tilles, Bloomfield, Conn., for Advest.

Jeffrey Pingpank, Cooney, Scully & Dowling, Hartford, Conn., for Charles Badain.

Mark Baldwin and Carol Ljungquist, Hartford, Conn., for Samuel Messina.

## RECOMMENDED RULING ON DEFENDANT MESSINA'S MOTION TO DISMISS AND RULINGS ON PLAINTIFF'S MOTION TO SEVER AND COUNTERCLAIM PLAINTIFF'S MOTION FOR PARTIAL RELIEF FROM STAY

F. OWEN EAGAN, United States Magistrate Judge.

The plaintiff, Gabriel Levine, has brought this action seeking money damages arising out of the allegedly wrongful transfer of certain shares of stock owned by him. Addressed herein are: (1) defendant Messina's motion to dismiss; (2) plaintiff's motion to sever; and (3) counterclaim plaintiff's motion for partial relief from stay.

### FACTUAL BACKGROUND

The plaintiff is a Florida resident with real estate and other business interests in Connecticut. On January 22, 1987, the plaintiff executed a promissory note in favor of the defendant The Connecticut Bank and Trust Company, N.A. ("CBT") for the sum of $3,000,000.00 as part of a loan agreement. As security for the loan, the plaintiff granted to CBT a security interest in thirty-three thousand shares of the common stock of International Business Machines ("IBM stock") which was being held by the defendant Advest, Inc., but was then-owned by the plaintiff. The stock also served as collateral to secure a line of credit extended to the plaintiff by CBT. As of the above date, the IBM stock had a value of $142.00, or an aggregate value of $4,686,000.00, and was held by Advest at its Rochester, New York office.

Also on January 22, 1987, CBT gave written notice to Advest of its security interest in the IBM stock. The notice stated that Advest should not attempt to transfer or dispose of the stock without the written permission of CBT, and appointed Advest as the custodian of the stock. This appointment of Advest as custodian of the IBM stock was allegedly arranged by defendant Charles Badain, the plaintiff's broker employed by Advest, and defendant Samuel Messina, the branch manager of Advest's Rochester, New York, office. On February 9, 1987, the plaintiff consented to this arrangement between CBT and Advest.

On July 20, 1987, the plaintiff paid the $3,000,000.00 promissory note, but CBT retained its security interest in the IBM stock to secure the line of credit it extended to the plaintiff. Also in July, 1987, defendant Badain allegedly told the plaintiff that he was concerned that Advest was unable to provide adequate errors and omissions insurance to protect the plaintiff's accounts with Advest; some of the plaintiff's accounts apparently exceeded the $10,000,000.00 amount. Badain informed the plaintiff that he would begin to solicit other brokerage firms that could better accommodate the plaintiff's accounts.

On Friday, September 18, 1987, Badain left the employ of Advest to begin an employment relationship with PaineWebber, another brokerage firm, on Monday, September 21, 1987. On Sunday, September 20, 1987, defendant Badain allegedly met with the plaintiff and his wife at their house in West Hartford, Connecticut, and induced them to sign documents that effectively transferred all of their investment accounts at Advest to PaineWebber. Beginning on September 21, 1987, Badain began the process of transferring all of the plaintiff's accounts to PaineWebber, including the 33,000 shares of IBM stock. The plaintiff alleges that Badain deceptively secured his signature and that of his wife on the documents effecting transfer of his Advest accounts to PaineWebber.

On September 28, 1987, the plaintiff borrowed $1,000,000.00 from CBT allegedly in

reliance upon the belief that the IBM stock was still in the possession of Advest and that CBT had perfected its security interest in the stock. By October 15, 1987, the IBM stock had been transferred from Advest to PaineWebber. By the end of October, PaineWebber had sold the stock, apparently to satisfy a debt incurred by the plaintiff in a PaineWebber margin account during the stock market crash of October, 1987.

The plaintiff commenced this action against CBT in May, 1988, stating several claims arising out of CBT's alleged negligence and breach of contract in failing to protect its security interest in the IBM stock. In response, CBT has filed counterclaims against the plaintiff to collect on the $1,000,000.00 loan taken by the plaintiff in September, 1987. CBT has also filed a third-party claim against Advest claiming negligent loss of bailment and indemnification. On October 1, 1990, the plaintiff, with permission of the court, filed a second amended complaint which included, for the first time, claims against Mr. Badain, the plaintiff's broker, and Mr. Messina, the former Advest branch manager who authorized the transfer of the IBM stock to PaineWebber.

On January 6, 1991, the United States Comptroller of the Currency declared CBT insolvent, and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC succeeded to "all rights, titles, powers, and privileges of [CBT] … with respect to the institution and the assets of the institution." Effective January 6, 1991, the FDIC organized a "bridge bank" known as the New Connecticut Bank and Trust Company, N.A. ("New CBT"), which assumed all the assets of the former CBT, including the counterclaims and cross-claims in this action. The FDIC became liable for all claims against CBT pursuant to 12 U.S.C. § 1821(d)(2)(H), including the claims made by the plaintiff in this case. Therefore, the FDIC is the defendant in the claims brought by the plaintiff against the former CBT, and the New CBT is the counterclaim plaintiff in the counterclaims and third-party claims brought by the former CBT.[1]

In this memorandum of decision, the court rules upon three motions. First, the court addresses the defendant Messina's motion to dismiss on the ground that this court lacks personal jurisdiction over him. Second, the court decides the New CBT's motion for partial relief from stay, which seeks permission to proceed upon the counterclaims against the plaintiff while the plaintiff's claims are stayed pending review by the FDIC administrative process. Finally, the court addresses the plaintiff's motion to sever his claims against the FDIC from his claims against the other defendants.

DISCUSSION

*A. Defendant Messina's Motion to Dismiss*

■ The defendant Messina moves to dismiss all claims against him on the ground that this court lacks jurisdiction over him, pursuant to Fed.R.Civ.P. 12(b)(2). The plaintiff opposes this motion, arguing that the Connecticut long-arm statute sufficiently confers personal jurisdiction upon this court, and that Mr. Messina has established sufficient minimum contacts with Connecticut so that the court's exercise of jurisdiction over him would not offend traditional notions of due process. The court agrees with Mr. Messina and grants his motion to dismiss.

Generally, to determine whether a district court has jurisdiction over a defendant, the court must look to the long-arm statute of the forum state. *Savin v. Ranier*, 898 F.2d 304 (2d Cir.1990); *Mozes on Behalf of General Elec. Co. v. Welch*, 638 F.Supp. 215, 223 (D.Conn.1986). The plaintiff has the burden of proof in establishing that a court has personal jurisdiction over a defendant. *Id.* at 306; *Greene v. Sha–Na–Na*, 637 F.Supp. 591, 594 (D.Conn.1986).

1. The FDIC filed a motion to be substituted as a defendant in place of CBT which was granted by Judge Clarie on February 5, 1991. A similar motion filed by the New CBT to be substituted as the plaintiff on the counterclaims and third party claims was granted by this court on May 15, 1991.

The court must make two inquiries before it may properly assert personal jurisdiction over a defendant. First, the court "must determine whether the state's long-arm statute authorizes the exercise of jurisdiction." *Sha–Na–Na*, at 595 (citations omitted). Second, if the court finds that the state's long-arm statute confers personal jurisdiction, it must determine whether the statute "comports with due process." *Id.; Shaw v. American Cyanamid Co.*, 534 F.Supp. 527, 529 (D.Conn.1982).

The Connecticut long-arm statute, codified at Conn.Gen.Stat. § 52–59b, allows courts to exercise personal jurisdiction over nonresident individuals under four circumstances, only one of which is relied upon by the plaintiff in this case. Specifically, the plaintiff relies upon § 52–59b(a)(3)(B), which provides that courts have personal jurisdiction over an individual who, in person or through an agent,

> commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he ... (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce....

In this case, the plaintiff concedes that the defendant Messina did not commit a tortious act in Connecticut, but asserts that Messina's tortious acts committed in New York caused the plaintiff harm in Connecticut.[2] Specifically, the plaintiff claims that Mr. Messina's wrongful delivery of the IBM stock to PaineWebber in October, 1987, caused harm to the plaintiff, a Florida resident, here in Connecticut. The plaintiff's argument completely misreads this district's case law on personal jurisdiction.

In determining whether § 52–59b(a)(3) confers jurisdiction over a defendant, "the threshold question ... is whether any injury to the plaintiff occurred in Connecticut." *Sha–Na–Na*, 637 F.Supp. at 597. The an-swering of this threshold question is guided by the "critical events" test adopted by this district in *Bross Utilities Service Corp. v. Aboubshait*, 489 F.Supp. 1366 (D.Conn.), *aff'd mem.*, 646 F.2d 559 (2d Cir.1980). The critical events test requires the plaintiff to offer "evidence of direct economic injury to the plaintiff within the state." *Sha–Na–Na* at 597.

In this case, the plaintiff has failed to offer any evidence of economic harm in Connecticut. In conclusory statements, the plaintiff asserts that he has suffered economic harm in Connecticut by virtue of the fact that he owns real estate and businesses in Connecticut and that his finances are located in Connecticut. However, the plaintiff does not allege that the IBM stock at issue in this case was an asset of one of his businesses or tied to any of his financial holdings in Connecticut. Indeed, at a deposition in this action, the following exchange took place:

Q: Do you have any business interest in Florida?

A: The stock, that's where I'm doing most of it in Florida.

Pltf's Deposition, July 20, 1988, at 23 (attached to deft's memo in support of motion to dismiss, docket no. 237). The "critical events" allegedly involving Mr. Messina in this case are the execution of the pledge agreement between Advest and CBT and the transfer of the IBM stock from the Rochester office of Advest to the Rochester office of PaineWebber. None of these events occurred in Connecticut. Therefore, the loss of equity in the stock occurred in New York, where the IBM shares were maintained. *See Bross*, 489 F.Supp. at 1375 (Connecticut corporation which lost profits from business venture in Saudi Arabia did not establish personal jurisdiction over defendants located in Saudi Arabia and Lebanon where all business transactions occurred in Saudi Arabia) (citing cases); *Sha–Na–Na*, 637 F.Supp. at 597, 598 (economic harm suffered by Connecticut resident as a result of perform-

---

**2.** See Pltf's Memo. in Opposition to Motion to Dismiss filed January 4, 1991 (docket no. 239) at 6.

ances by music band outside of Connecticut resulted from conduct out of state; 52–59b(a)(3)(B) not satisfied by remote or consequential injuries which occur in Connecticut only because the plaintiff is domiciled or conducting business in the state); *Connecticut Artcraft Corp. v. Smith*, 574 F.Supp. 626 (D.Conn.1983) (no personal jurisdiction in action by Connecticut corporation against former employees for illegal use of trade secrets where defendants transact no business in Connecticut and any harm would be suffered by the plaintiff in the state where trade secrets were wrongfully used).

■ Further, although the above reasoning is dispositive of defendant Messina's motion to dismiss, the court notes that it is doubtful that an exercise of personal jurisdiction over Mr. Messina in this case would comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Courts may only exercise jurisdiction over an individual who has certain "minimum contacts" with the forum state. *Id.* "It is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). In this case, there is no evidence that Mr. Messina has had any business or other contact with anyone in

the state of Connecticut, including the plaintiff. In fact, at his deposition, the plaintiff admitted that he has never met Mr. Messina or spoken or corresponded with him. *See* Pltf's Deposition, July 20, 1988, at 2–3 (attached to deft's reply memo in support of motion to dismiss, docket no. 259). There being no evidence that Mr. Messina conducts any business in Connecticut shows that exercise of personal jurisdiction over him would violate his due process rights.[3] The defendant Messina's motion to dismiss is granted.

### B. Motion for Partial Relief From Stay

■ The counterclaim and third-party plaintiff, the New CBT, moves for partial relief from the stay ordered by Judge Clarie on February 4, 1991. Judge Clarie granted the FDIC's motion for stay in a margin endorsement, citing 12 U.S.C. § 1821(d)(13)(D)(i), which provides that no court shall have jurisdiction over claims against the FDIC acting as receiver for failed financial institutions until the claims have been presented to the FDIC for administrative review.[4] Upon denial of a claim by the FDIC or the elapse of 180 days, a claimant may continue a stayed action in the district court.

However, the stay granted by Judge Clarie was issued pursuant to 12 U.S.C. § 1821(d)(13)(D)(i), which is the statutory provision relating to claims against the FDIC as receiver. Therefore, because the

---

**3.** The court is compelled to comment upon the "affidavits" submitted by the plaintiff and his counsel in opposition to the defendant's motion to dismiss. Initially, plaintiff's counsel submitted an "affidavit" which purported to establish facts supportive of this court's exercise of jurisdiction over Mr. Messina. This affidavit was patently insufficient, and was replaced with a nearly identical affidavit endorsed by the plaintiff shortly after defendant noticed plaintiff's counsel's deposition. The plaintiff's affidavit, ¶ 1, states:

I have made myself familiar with the facts and circumstances pertaining to this motion as hereinafter set forth, upon information and belief based upon the discovery and investigation conducted on my behalf.

The court finds that this affidavit is not based upon the personal knowledge of the plaintiff

and does not establish that the plaintiff is competent to testify as to the facts set forth therein. The court makes note of this fact to warn the plaintiff and especially his counsel that the submission of baseless "affidavits" constitutes bad faith and tends to mislead the court. Similar conduct in the future will, no doubt, result in the imposition of Rule 11 sanctions.

**4.** The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), P.L. 101–73, includes a process for handling claims against financial institutions that have been placed in FDIC receivership. The FDIC must give notice that claims must be filed within a specified time, and must either allow or disallow each claim within 180 days from the date the claim was filed. *See* 12 U.S.C. §§ 1821(d)(5)(A), (B) and (D).

FDIC is not a party in the New CBT's action to recover on the loan taken by the plaintiff, the claims for money damages made by the New CBT in its counterclaims against the plaintiff are not subject to the stay entered by Judge Clarie. The New CBT is thus relieved from the stay entered in this case to the extent that it seeks to recover on its counterclaims against the plaintiff.

### C. Motion to Sever

 Finally, the plaintiff moves for a severance of its claims against the remaining defendants from its claims against the FDIC as receiver. Rule 21 of the Federal Rules of Civil Procedure provides, in part, that "[a]ny claim against a party may be severed and proceeded with separately." Similarly, Rule 42(b) provides, in pertinent part, that the court may order the separate trial of any claim, including a counterclaim, "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy...." Although the severance provision in Rule 21 appears in a rule relating to the misjoinder and non-joinder of parties, it is clear that Rule 21 confers upon the district courts the authority to sever claims prior to trial. *See generally* 7 Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1689 (1986).

Severance is appropriate when it will serve the ends of justice and further the prompt and efficient disposition of litigation. *General Tire & Rubber Co. v. Jefferson Chemical Co.*, 50 F.R.D. 112 (S.D.N.Y.1970). Generally, counterclaims are severable when they are based upon an entirely different factual situation from that upon which the plaintiff's claims are based. *T.S.I. 27, Inc. v. Berman Enterprises, Inc.*, 115 F.R.D. 252 (S.D.N.Y.1987); *Spencer, White & Prentis, Inc. v. Pfizer, Inc.*, 498 F.2d 358, 362 (2d Cir.1974).

In this case, the plaintiff's claims against the defendants arise out of the same series of transactions relating to the transfer of the IBM stock from Advest to PaineWebber. Severance of these claims would result in duplicitous litigation because the plaintiff would proceed against Advest and Mr. Badain only to repeat the bulk of its claims against the FDIC after the stay in this case expires. Such a course of conduct does not further the interests of justice. However, because the New CBT's counterclaims arise out of an entirely different set of circumstances, namely the execution of and default upon a promissory note, the New CBT's counterclaims are properly severed from the remainder of the action.

### CONCLUSION

For the foregoing reasons, the defendant Messina's motion to dismiss (docket no. 236) is GRANTED. The counterclaim plaintiff New CBT's motion for partial relief from stay (docket no. 262) is GRANTED. Plaintiff's motion for severance (docket no. 260) is DENIED. It is further ORDERED that the counterclaims brought by the New CBT against the plaintiff are severed from the remainder of the action. Other than the proceedings on New CBT's counterclaims, this action shall remain stayed in accordance with Judge Clarie's order of February 4, 1991.

Any objections to this report and recommendation must be filed with the Clerk of Courts in accordance with 28 U.S.C. § 636, Rule 72 of the Federal Rules of Civil Procedure and Rule 2 of the Local Rules for United States Magistrate Judges.