**Stephen C. EDBERG, Stephen C. Wardlaw, and IDEXX Laboratories, Inc., Plaintiffs,**

v.

**NEOGEN CORPORATION, Defendant.**

No. 3:98CV00717 (GLG).

United States District Court, D. Connecticut.

Aug. 4, 1998.

Mary S. Consalvi, Lyon & Lyon LLP, La Jolla, CA, Thomas J. Rechen, Pepe & Hazard LLP, Hartford, CT, for Plaintiffs.

Mark R. Fox, Fraser Trebilcock Davis & Foster, P.C., Lansing, MI, Edward R. Scofield, Zeldes, Needle & Cooper, P.C., Bridgeport, CT, for Defendant.

## OPINION

GOETTEL, District Judge.

This is a patent and trade dress infringement case, in which the defendant, Neogen Corporation, has filed a motion to dismiss on the ground of lack of personal jurisdiction. Fed.R.Civ.P. 12(b)(2). Defendant, a foreign corporation, asserts that the requirements for personal jurisdiction have not been met by virtue of a single sale of its product in the forum state, which was orchestrated by the plaintiff, IDEXX Laboratories, Inc. It further asserts that its maintenance of a Web page on the Internet neither satisfies the requirements for personal jurisdiction under Connecticut's long-arm statute nor meets the minimum contacts requirement of the Due Process Clause. After consideration of the parties' submissions and after oral argument of counsel, this Court grants defendant's motion to dismiss under Rule 12(b)(2), Fed. R.Civ.P. [Doc. # 17]. Accordingly, the Court denies defendant's motion to transfer this matter to the Western District of Michigan [Doc. # 17] and denies plaintiffs' motion to have this case reassigned to Judge Janet Bond Arterton, U.S.D.J., D. Conn. [Doc. # 16].

## Background

### The Underlying Patents

This case involves patented products and devices used for the detection and quantification of certain microbiological pathogens, such as *Escherichia coli (E.coli)* and other related organisms, found in food and water. There are three patents at issue. Two are owned by plaintiffs, Drs. Edberg and Wardlaw, professors at Yale University in New Haven, Connecticut. These patents are licensed to plaintiff IDEXX. The third is owned by IDEXX. The three patents, described in general terms, are as follows:

United States Patent No. 5,700,655 (the '655 patent), entitled "Method for Quantification of Biological Material in a Sample," covers a circular incubation plate having a multitude of recessed wells. The wells are designed to form separate incubation chambers that hold a portion of a liquid sample containing chemical or microbiological reagents. The plate is then incubated until the presence or absence of the biological material is determined. The plate is sterile and has a cover to prevent contamination of the sample. The named inventor on the patent is David E. Townsend, a research scientist with IDEXX.

United States Patent No. 4,925,789 (the '789 patent), entitled "Method and Medium for Use in Detecting Target Microbes In Situ in a Specimen Sample of a Possibly Contaminated Material," claims the microbiological medium used to test water samples for the presence of microorganisms, including *E. coli* and other coliforms.[1] It also claims methods of conducting tests using the medium, which contains a nutrient that can be significantly metabolized only by a target microorganism. A second reaction accompa-

---

1. Coliforms are a type of bacteria, generally found in the large intestines of man and other warm-blooded animals, of which *E. coli* is but one example. Not all are pathogenic. However, they are considered to be indicator organisms, meaning that their presence in water or food is an indication of contamination of an intestinal origin. Thomas D. Brock & Michael T. Madigan, *Biology of Microorganisms* § 15.12 (5th ed.1988).

nies the metabolism of this specific nutrient and causes a "tell-tale" chemical or physical change in the medium (such as a change in color, which indicates the presence of coliforms, or a fluorescence, which indicates the presence of *E. coli*), which is readily detectible, thus indicating the presence of the target microorganism in the sample.[2] Dr. Edberg is the named inventor on this patent. United States Patent No. 5,429,933 (the '933 patent), entitled "Detection of First Generation Environmental Sourced Microbes in an Environmentally–Derived Sample," is a continuation in part of the '789 patent and claims priority from the '789 patent. Dr. Edberg is also the named inventor on this patent.

IDEXX manufactures and sells environmental diagnostic assay kits for *E. coli* and total coliforms under the trademarks Colilert® and Colisure®. These products are covered by the '789 and '933 patents. In addition, IDEXX manufactures and sells a diagnostic product line, consisting of an auto-aliquoting incubation vessel for the detection and quantification of total coliforms, *E. coli*, and other biological material under the trademark SimPlate®. This device is covered by the '655 patent.

Defendant Neogen manufactures and sells a product under the registered trademark Reveal®, including the Reveal® Bio–Plate, which plaintiffs contend infringes the 655 patent, and Reveal® Bio–Plate Growth Medium, which plaintiffs allege infringes the '789 and '933 patents. Neogen's Reveal® products are also used for the detection of total coliforms and *E. coli*, similar to IDEXX's products. The Reveal® Bio–Plate is similar in appearance to IDEXX's SimPlate®, although it is octagonal in shape.

### The Jurisdictional Facts

Defendant Neogen is a Michigan corporation with its principal place of business in Lansing, Michigan. It is undisputed that Neogen has no property in Connecticut; it has no offices, distributors, employees, or agents in Connecticut; it has no personal property in Connecticut; and, it is not licensed to do business in the State of Connecticut. Nevertheless, plaintiffs attempt to assert personal jurisdiction over this non-resident defendant by virtue of its "doing business in Connecticut." (Compl. at ¶ 3). Plaintiffs further assert that Neogen mass-produces, markets, and sells its Reveal® Bio–Plate products in interstate commerce throughout the United States. (Compl.¶¶ 19–20). Neogen denies that it does business in Connecticut, although it does admit that it had one sale in the amount of $246.00 to Cadbury–Schweppes in Trumbull, Connecticut in 1997 for a single order of its Reveal® Bio–Plates (a single order consists of 200 plates) and two containers of its Reveal® Bio–Plate Growth Medium. As discussed more fully below, Neogen maintains that this sale was orchestrated by IDEXX to attempt to establish personal jurisdiction over Neogen in Connecticut, as part of its forum-shopping activities.[3]

With respect to the one admitted sale in Connecticut, Neogen asserts that it did not solicit this sale. Instead, it alleges that this order was placed by Cadbury–Schweppes at the behest of IDEXX, and that this was, in reality, a sale to IDEXX, which has its principal place of business in Maine. That the order was placed by Cadbury for IDEXX is not disputed. Neogen has produced the affidavit of Mr. Anthony Dworetsky of Cadbury, who testified that he was contacted by Mr. Lee Flores of IDEXX, who requested Dworetsky to contact Neogen and attempt to have it sell or ship to him in Connecticut its Reveal® Bio–Plate Multiple Test Medium, which Dworetsky did, in fact, do. Upon ob-

---

2. See *Environetics, Inc. v. Millipore Corp.*, 923 F.Supp. 344, 345 (D.Conn.1996) (discussing the '789 patent).

3. Indeed, Neogen accuses plaintiffs not only of forum-shopping, but judge-shopping. IDEXX had previously received two favorable rulings from Judge Arterton in this District in cases involving some or all of the same patents, and apparently was anxious to have this case before Judge Arterton. See *Environetics, Inc., Edberg,*

*Wardlaw, and Access Medical Systems, Inc. v. Millipore Corp.,* 923 F.Supp. 344 (D.Conn.1996) (involving the '789 patent), and *Environetics, Inc., Edberg, Wardlaw, Access Medical Systems, Inc., and Idexx v. Millipore Corp.,* No. 2:92CV0325(JBA) (D.Conn.) (involving the '933 patent). In fact, as noted above, plaintiffs have filed a motion to transfer this case to Judge Arterton.

taining the Reveal® products from Neogen, Dworetsky immediately shipped them to IDEXX in Maine. Thus, he says, the Neogen products remained in the State of Connecticut for less than one day.

The parties do dispute, however, why IDEXX asked Cadbury to place this order. Neogen asserts that IDEXX involved Cadbury to provide a basis for in personam jurisdiction over Neogen as part of its forum-shopping efforts; IDEXX maintains that this was done to allow it to purchase a sample of the infringing products.

In an effort to justify their motives in inducing Cadbury to make this purchase for it, IDEXX has supplied the affidavit of David Townsend, the inventor of the '655 patent, who stated that, in the spring of 1997, he had seen Neogen's alleged infringing products at the American Society of Microbiologists Trade Show,[4] but that Neogen's representatives, who knew Townsend to be an IDEXX employee, refused to sell any of the products to him.

Plaintiffs have also provided the affidavit of Mr. Flores, who states that IDEXX's product manager asked all of the regional sales managers to attempt to obtain a sample of Neogen's Reveal® Bio–Plate Medium and Device. This request was not limited to a Connecticut customer, but was a general request made of all the regional sales managers throughout the country. Accordingly, Flores contacted Dworetsky, one of his oldest customers, whom he characterizes as the "logical" person to assist him. He admits that he did not pay Cadbury for this order. Instead, he asked if Cadbury would like IDEXX to issue a check or reimburse them with an equivalent amount of product. Dworetsky chose the latter. Neogen suggests that this was done to cover up IDEXX's involvement with this purchase.

### The Parties' Preliminary Skirmishes

After the instant lawsuit was served on Neogen, Neogen filed a "Notice of Special and Limited Appearance of Counsel" for the sole and exclusive purpose of contesting *in personam* jurisdiction and venue in this case. Upon receipt of this Notice, plaintiffs' California counsel wrote local counsel and Michigan counsel for Neogen, requesting that they reconsider their intent to contest personal jurisdiction based upon the sale to Cadbury. A copy of the Cadbury invoice was attached. The letter stated in relevant part as follows:

> In light of this evidence and abundant legal precedent, we believe that there is no legitimate basis to argue that the Court lacks personal or subject matter jurisdiction to hear this case. . . .

> As you are aware, Rule 11 of the Federal Rules of Civil Procedure requires that before Neogen files a Motion to Dismiss that its attorney certify "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that among other things, the Motion is not frivolous or being brought for any improper purpose, and that it is likely to be supported by the evidence. Since a single sale of the allegedly infringing product is sufficient to confer jurisdiction over Neogen, (see, e.g., *Beverly Hills Fan Co.* and *North American Philips v. American Vending Sales, Inc.*, 35 F.3d 1576 (Fed.Cir.1994)) Neogen's sale of two hundred of the alleged infringing products is certainly sufficient. Accordingly, we request that Neogen confirm that it will not move to contest jurisdiction because such a motion would be frivolous and a waste of judicial and litigant resources.

> If Plaintiffs are forced to oppose a motion for lack of personal or subject matter jurisdiction, then they will, pursuant to Rule 11(c), seek to recover reasonable expenses and attorney's fees incurred in opposing the motions. . . .

Nowhere in the letter does plaintiffs' counsel indicate that this one purchase, on which IDEXX exclusively relied at the time the letter was written, had been made at the behest of IDEXX, or that this product had been shipped within a day from Connecticut

---

**4.** Townsend testified to seeing the Neogen products at two trade shows in 1997. One was in New Orleans, Louisiana. The location of the other is not disclosed in his affidavit. However, it is not suggested by plaintiffs that it was in Connecticut.

to Maine and was never intended for use in Connecticut. Nevertheless, counsel threatened Rule 11 sanctions if Neogen so much as asked this Court to rule on the issue of personal jurisdiction. As will be discussed more fully below, these omitted facts become extremely significant on the issue of whether Neogen "purposefully availed" itself of contacts within the State of Connecticut.

At oral argument, this Court brought this lack of candor to the attention of IDEXX's California counsel. Counsel's response—to the effect that IDEXX needed Neogen's product to evaluate the merits of its infringement claim—completely missed the mark. Of course, IDEXX should have thoroughly researched the infringement question before filing suit. Rule 11 requires that the allegations and factual contentions in the complaint have evidentiary support. Rule 11(b)(3), Fed.R.Civ.P. That does not mean, however, that this one sale should be relied upon as the sole basis for personal jurisdiction over a manufacturer that had no other contacts with the forum state nor that opposing counsel should be threatened with Rule 11 sanctions for challenging jurisdiction based upon this single sale.

The Court's concern focused on counsel's lack of professionalism and forthrightness in the letter that was sent to her adversary and the threatened use of Rule 11 sanctions to intimidate her adversary into not filing a motion to dismiss. Rule 11 should never be used as a litigation tactic for intimidating opposing counsel from asserting a meritorious position. *See Rush v. McDonald's Corp.*, 966 F.2d 1104, 1123 (7th Cir.1992); *Stevenson v. Employers Mut. Ass'n*, 960 F.Supp. 141, 144 n. 3 (N.D.Ill.1997); *Wood v. New Orleans National Collection Service, Inc.*,

Civ. A. No. 95–1201, 1995 WL 686744, at *4 (E.D.La. Nov.17, 1995).[5] *See also Nakash v. United States Department of Justice*, 708 F.Supp. 1354, 1370 (S.D.N.Y.1988) (noting that competent attorneys should not be placed in a position of having to justify actions taken in good faith, under threat of Rule 11 sanctions). Additionally, the Court notes counsel's lack of candor with the Court in the papers filed in opposition to defendant' motion to dismiss. *See* Note 6, *infra*.

It would be unfair to point only to plaintiffs' counsel's lack of professionalism. Neogen's Michigan counsel curtly responded to what he characterized as her "supercilious, but highly amusing, letter," noting that "[a]lthough we have not as [sic] met or even spoken by telephone, based upon your letter, I can tell already that we are not likely to get along well in this matter." Based upon the facts known to Michigan counsel at the time,[6] this type of response does not exhibit the degree of civility that this Court would expect from counsel appearing before it, nor, as noted at oral argument, the civility that is generally observed among Connecticut counsel.

At a time when lawyers are regarded by many as "occupying ... the bottom rungs on the ladder of public esteem," [7] not surprisingly, the most recent issue of the American Bar Association Journal (Vol.84, August 1998) is devoted to the subject of professionalism. In an article on *Professional Obligations*, former FBI Director, William S. Sessions emphasizes that each lawyer in America "owes to opposing counsel, in the ... pursuit of litigation, courtesy, candor, cooperation and scrupulous observation of all agreements and mutual understandings." William S. Ses-

---

5. Indeed, in that case, the court noted that the Louisiana Code of Professionalism specifically prohibited this type of conduct.

6. At this time, Neogen was not aware of the circumstances surrounding the one Connecticut sale. In fact, when Neogen filed its initial memorandum in support of its Motion to Dismiss, it simply mentioned in a footnote that it believed that it was "setup" to sell this one order in Connecticut for purposes of attempting to manufacture personal jurisdiction in this forum. Neogen noted that the Connecticut purchaser ordered the smallest amount possible. Conspic-

uously absent from plaintiffs' opposition to Neogen's motion to dismiss was a response to this footnote. In its reply, Neogen states that, since filing its motion to dismiss, it confirmed its suspicion that IDEXX was behind the purchase by Cadbury.

7. William S. Sessions, *Professional Obligations*, 84 A.B.A.J. 62 (August 1998). *See also* Susan Daicoff, *Lawyer, Know Thyself: A Review of Empirical Research on Attorney Attributes Bearing on Professionalism*, 46 Am.L.Rev. 1337, 1344 (June 1997).

sions, *Professional Obligations*, 84 ABA Journal 62 (Aug.1998) (quoting the Texas Lawyer's Creed).

In another article appearing in the same issue of the ABA Journal, Judge Louis H. Pollak[8] quotes Justice Anthony Kennedy's address to the 1997 Annual Meeting on the issue of civility:

> It is not some bumper-sticker slogan, "Have you hugged your adversary today?" Civility is the mark of an accomplished and superb professional, but it is even more than this. It is an end in itself. Civility has deep roots in the idea of respect for the individual.
>
> We are civil to each other because we respect one another's human aspirations and equal standing in a democratic society. We must restore civility to every part of our legal system and public discourse. Civility defines our common cause in advancing the rule of law.

Louis H. Pollak, *Professional Attitude*, 84 ABA Journal 66 (August 1998) (quoting Justice Kennedy's Speech at the 1997 ABA Annual Convention). "Discourtesies that sully the brotherhood and sisterhood of the bar are a significant aspect of the incivility Justice Kennedy has warned us against." *Id.* at 68.

While the conduct of counsel may not have violated the relevant ethical codes, this Court is disturbed by the lack of candor and the incivility that was displayed in this case. There are certainly more egregious examples, but that does not excuse the conduct exhibited here. The Court urges counsel to consider in the future not only how a lawyer must practice, but how a lawyer should practice. *See* Jerome J. Shestack, *Taking Professionalism Seriously*, 84 ABA Journal 70, 72 (August 1998). With that admonition, the Court returns to the issue of whether this Court has personal jurisdiction over defendant Neogen.

**8.** Louis H. Pollak is a senior judge of the United States District Court for the Eastern District of Pennsylvania. He is the former dean of the law schools of Yale and the University of Pennsylvania.

**9.** Prior to the 1997 amendments, this was Conn. Gen.Stat. § 33–929(e)(3) and (4), which is cited

### Discussion

 When personal jurisdiction is challenged through a motion to dismiss under Rule 12(b)(2), the plaintiff bears the burden of showing that the court has jurisdiction over the defendant. *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). At this stage in the proceedings, the plaintiffs must make out only a prima facie showing of personal jurisdiction through their own affidavits and supporting materials, and all affidavits and pleadings must be construed in the plaintiffs' favor. *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir.1986); *Northern Tankers (Cyprus) Ltd. v. Backstrom*, 901 F.Supp. 72, 77 (D.Conn.1995).

 Personal jurisdiction in a trade dress and patent infringement case is governed by the law of the forum State. *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997). Thus, in this case, we look to the law of Connecticut, which requires a two-part inquiry in resolving questions of personal jurisdiction. First, we must determine whether the defendant is amenable to service of process under Connecticut's long-arm statute. Second, we must assess whether the statutory authority comports with due process. *See Greene v. Sha–Na–Na*, 637 F.Supp. 591, 594–95 (D.Conn.1986); *Apolinario v. Avco Corp.*, 561 F.Supp. 608, 610 (D.Conn.1982); *Thomason v. Chemical Bank*, 234 Conn. 281, 295, 661 A.2d 595 (1995).

### Connecticut's Long–Arm Statute

Plaintiffs rely on Connecticut's long-arm statute, Conn.Gen.Stat. § 33–929(f)(3) and (4),[9] as the basis for personal jurisdiction over Neogen. This statute provides:

> (f) Every foreign corporation shall be subject to suit in this state, by a resident of this state[10] or by a person having a usual

by the plaintiffs. Prior thereto, the section on service of process on foreign corporations was codified at Conn.Gen.Stat. § 33–411.

**10.** Edberg and Wardlaw are Connecticut residents. Neogen characterizes them as "nominal and superfluous parties." However, they are the

place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: ...

(3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers; or

(4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

■ The sections relied upon by plaintiffs do not require Neogen to have transacted business in the State of Connecticut. *Whelen Engineering Co., Inc. v. Tomar Electronics Inc.*, 672 F.Supp. 659, 662 (D.Conn.1987); *Thomason, supra,* 234 Conn. at 295–97, 661 A.2d 595. Although plaintiffs argue that subsection (3) should apply because "Neogen had, or should have had, a reasonable expectation that its infringing goods would be used or consumed in this District when it sold and shipped into this forum at least 200 Reveal® Bio–Plates and two containers of Reveal® Bio–Plate Growth Medium," the uncontested affidavit of the Cadbury representative indicates that the goods were never used on consumed in this State. Plaintiffs do not assert otherwise. Therefore, by its very terms, subsection (3) would not apply.

■ Subsection (4) addresses tortious conduct within this State. The sale of an infringing article by one party to another in a different forum has been field to constitute a tort in the buyer's forum. *See North American Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576, 1579 (Fed.Cir. 1994); *E–Data Corp. v. Micropatent Corp.*, 989 F.Supp. 173, 177 (D.Conn.1997); *Whelen, supra,* 672 F.Supp. at 662 (holding that the tortious conduct in a trademark infringement case takes place where the passing off oc-

curs); *see also Marvel Products, Inc. v. Fantastics, Inc.,* 296 F.Supp. 783, 787 (D.Conn. 1968) (holding that, in an unfair competition case, the wrong occurs where the passing off occurs, i.e., where the deceived customer buys the defendant's product with the belief that he is buying the plaintiff's). Additionally, only a single act of tortious conduct need be shown in order to invoke subsection (4). *Whelen, supra,* 672 F.Supp. at 663; *Teleco Oilfield Services, Inc. v. Skandia Insurance Co., Ltd.,* 656 F.Supp. 753, 758 (D.Conn. 1987). Because Neogen did sell allegedly infringing products in the State of Connecticut, we find that subsection (4) of Connecticut's long-arm statute, Conn.Gen.Stat. § 33–929(f)(4), would reach this activity.

### Due Process Requirements

Having found that the requirements of Connecticut's long-arm statute have been met, we turn to the second prong of the jurisdictional analysis, which requires us to determine whether the exercise of jurisdiction over Neogen would violate the due process clause. The due process requirement for personal jurisdiction protects a person or entity without meaningful ties to the forum state from being subjected to binding judgments within its jurisdiction. *Metropolitan Life, supra,* 84 F.3d at 567. Because our jurisdiction in this case is based upon the existence of a federal question, the due process requirements derive from the Fifth Amendment to the Constitution, rather than the Fourteenth. *Aerogroup International, Inc. v. Marlboro Footworks, Ltd.,* 956 F.Supp. 427, 439 & n. 16 (S.D.N.Y.1996). The same general due process principles of "minimum contacts" and "reasonableness" found in cases based upon diversity jurisdiction, however, apply to actions premised on the existence of a federal question. *Metropolitan Life, supra,* 84 F.3d at 567; *DeJames v. Magnificence Carriers, Inc.,* 654 F.2d 280, 283 (3d Cir.), *cert. denied,* 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981).

■ A two-step analysis is used to determine whether the exercise of personal jurisdiction would offend the requirements of due process. First, the court must determine

inventors, owners, and licensors of two of the patents.

whether the defendant has minimum contacts with the forum. If so, the second question that must be addressed is whether the assertion of jurisdiction comports with the traditional notions of fair play and substantial justice, that is, whether it is reasonable under the circumstances of the particular case. *In re Perrier Bottled Water Litigation,* 754 F.Supp. 264, 267 (D.Conn.1990) (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

In assessing Neogen's minimum contacts with Connecticut, we are required to determine whether there has been some act by Neogen by which it has purposely availed itself of the privilege of conducting activities within the forum State. *See Ensign–Bickford Co. v. ICI Explosives USA Inc.,* 817 F.Supp. 1018, 1029 (D.Conn.1993) (citing *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). "The constitutional touchstone of the determination whether an exercise of personal jurisdiction comports with due process remains whether the defendant purposefully established minimum contacts in the forum State." *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 108–09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (internal citations and quotations omitted). The Supreme Court in *Asahi* reaffirmed that the minimum contacts "must have a basis in some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.... Jurisdiction is proper ... where the contacts proximately result from action by the defendant himself that create a substantial connection with the forum State." *Id.* at 109, 107 S.Ct. 1026 (internal quotations and citations omitted). The placement of a product in the stream of commerce without more is not an act of the defendant purposefully directed to the forum State. *Id.* at 112, 107 S.Ct. 1026. Additional conduct of the defendant that may indicate an intent or purpose to serve the market in the forum State includes designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. *Id.*

In the instant case, plaintiffs assert that Neogen's single $246.00 sale to Cadbury constitutes "minimum contacts" sufficient to sustain personal jurisdiction. This "contact," however, was initiated by IDEXX, not by the defendant. Regardless of IDEXX's motives, it was still the acts of IDEXX that brought the infringing product into the forum, not Neogen's promotion, advertising, or sales activities. *Cf. Whelen, supra,* 672 F.Supp. at 664 (finding due process requirements met where defendant readily supplied potential customers with catalogs advertised in periodicals having Connecticut circulation, provided products on order either directly or knowingly through its distributor, and demonstrated a readiness to initiate telephone solicitation of Connecticut customers and anticipated a viable and growing sales market in the State). Moreover, the courts have repeatedly held that jurisdiction may not be manufactured by the conduct of others. *See Chung v. NANA Development Corp.,* 783 F.2d 1124, 1127 (4th Cir.), *cert. denied,* 479 U.S. 948, 107 S.Ct. 431, 93 L.Ed.2d 381 (1986). Under such circumstances a defendant cannot be said to have purposefully availed itself of the forum. *See DeSantis v. Hafner Creations, Inc.,* 949 F.Supp. 419, 425 (E.D.Va.1996). Only those contacts with the forum that were created by the defendant, rather than those manufactured by the unilateral acts of the plaintiff, should be considered for due process purposes. To hold otherwise would allow a plaintiff to manufacture jurisdiction over a non-resident defendant in any forum, regardless of how inconvenient, even when the defendant has not purposefully directed any activity toward the forum state. *See Regent Lighting Corp. v. American Lighting Concept Inc.,* Civil No. 2:96CV439, 1997 WL 1051425, 1997 LEXIS 4041, *16 (M.D.N.C. Feb. 10, 1997).

At oral argument, plaintiffs relied heavily on the case of *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558 (Fed.Cir.1994), *cert. dismissed,* 512 U.S. 1273, 115 S.Ct. 18, 129 L.Ed.2d 917 (1994), which held that the

purposeful minimum contacts requirement of the due process clause was met by virtue of defendants' placing the "accused fan" in the stream of commerce through an established distribution chain, knowing the likely destination of the products, and "their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court here." *Id.* at 1566. *Beverly Hills Fan Co.* is clearly distinguishable on its facts from the instant case, where Neogen's contacts with the forum were limited to a single sale (initiated by plaintiffs), as opposed to the shipment of a substantial amount of goods into the forum state through an established distribution channel.

Accordingly, we hold that this one sale in Connecticut, initiated by plaintiffs, did not satisfy the minimum contacts of the due process clause.

### Defendant's Web Site on the Internet

■ Following the initial round of briefs on defendant's motion to dismiss, plaintiffs requested permission to file a surreply, in which they raised for the first time the existence of defendant's Web site on the Internet as a basis for personal jurisdiction. Plaintiffs have provided a print-out of Neogen's Web-page on the Internet, which lists the following categories of information:

—Inventor Information

—Elisa Kits for Equine/Greyhound Racing

—Elisa Kits for Research

—Mycotoxin Test for the Feed, Grain, and Nut Industries

—Fruit, Vegetable and Turf Test Kits

—Equine Health Care and Grooming Products

—Meat and Poultry Microbial Screening Tests

—Ready to Use Substrates

—Seafood Test Kits

—The Neogen Story

—Veterinary Instruments

—Employment Opportunities.

The second page is a literature request form. The third page contains ordering information, which requires the person placing an order to call Neogen in Lansing between 8:00 and 6:00, Monday through Friday, at an "800" number, or to fax or mail an order to its offices in Lansing, Michigan, or Lexington, Kentucky.

Relying on *Inset Systems, Inc. v. Instruction Set, Inc.*, 937 F.Supp. 161 (D.Conn.1996), plaintiffs assert that Neogen's Web site at www.neogen.com is available to residents of Connecticut and is a sufficient contact with the forum to subject Neogen to personal jurisdiction. The Web site, they claim, is replete with hypertext links that permit users to learn about Neogen products, order product information through an online catalog, e-mail Neogen representatives with specific comments or questions, and order products through a toll-free "800" number.

In response, Neogen relies on *E–Data Corp. v. Micropatent Corp.*, 989 F.Supp. 173 (D.Conn.1997), and *Bensusan Restaurant Corp. v. King*, 937 F.Supp. 295 (S.D.N.Y. 1996), *aff'd*, 126 F.3d 25 (2d Cir.1997), for the proposition that merely maintaining a Web page is insufficient to subject it to personal jurisdiction in Connecticut, particularly given the degree of activity that is required of a user before a product is actually ordered. Neogen points to the fact that there is no evidence that Neogen sought particularly to encourage Connecticut residents to access the Web site, which is available worldwide. They assert that to adopt plaintiffs' position would subject every person or entity that merely maintains a Web site to nationwide, indeed worldwide, jurisdiction.

As the Internet has experienced nearly exponential growth over the past few years, its impact on conventional notions of personal jurisdiction has been hotly debated in courts throughout the country and in countless law review articles and treatises. *See* Robert W. Hamilton and Gregory A. Castanias, *Tangled Web: Personal Jurisdiction and the Internet*, 24 Litigation 27 (Winter, 1998) As one article notes, "[b]ecause of its 'geographic transparency' and unlimited adaptability to commercial uses, the Internet has begun to test the limits and underlying legitimacy of territorial concepts of personal jurisdiction." Kevin M. Fitzmaurice and Renu N. Mody, *International Shoe Meets the World Wide Web: Whither Personal Jurisdiction in*

*Florida in the Age of the Internet?*, 71 Fla. B.J. 22 (Dec.1997). Some courts have differentiated between those cases in which a defendant merely posts information on a passive site on the Internet and those in which the defendant is actually conducting business over the Internet through and interactive site. *See Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414 (9th Cir.1997); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1123–25 (W.D.Pa.1997).

Generally, despite the Internet's lack of territorial boundaries, the courts have attempted to apply traditional concepts of personal jurisdiction to the Internet, such as whether the defendant intentionally reached beyond its own state to engage in business with residents of the forum state. For example, in *Hearst Corp. v. Goldberger,* No. 96 Civ. 3620(PLK)(AJP), 1997 WL 97097 (S.D.N.Y.1997), the court refused to find personal jurisdiction where the foreign defendant's Internet activity was directed at a national audience and not specifically at the forum state. The court analogized the defendant's Web site to an advertisement in a national magazine. Its Web site had been accessed by a number of New Yorkers, but no sales had been made in New York. Similarly, in *Bensusan Restaurant Corp., supra,* a trademark infringement case, the district court field that the mere fact that a person can gain information on the allegedly infringing product on the Internet is not the equivalent of a person advertising, promoting, selling or otherwise making an effort to target its product for a New York audience. In analyzing the constitutional due process issue, the district court explained that the defendant had done nothing to purposefully avail himself of the benefits of the forum state. *Id.,* 937 F.Supp. at 301. Instead, the defendant, like numerous others, simply created a Web site and permitted anyone who could find it to access it. "Creating a site, like placing a product into the stream of commerce, may be felt nationwide—or even worldwide—but, without more, it is not an act purposefully directed towards the forum state." *Id. See also Graphic Controls Corp. v. Utah Medical Products, Inc.,* No. 96–CV–0459E(F), 1997 WL 276232, at *3 (W.D.N.Y. 1997) (in action to declare a patent invalid,

the foreign defendant's 800 number and Web site did not indicate purposeful availment of the benefits of the forum, and, therefore, there was no jurisdiction) However, in *Zippo Mfg. Co., supra,* where the defendant had an Internet news service with approximately 3,000 paying subscribers in the forum state, the court held that the defendant had purposefully availed itself of the forum's jurisdiction. And, in *Resuscitation Technologies, Inc. v. Continental Health Care Corp.,* No. IP 96–1457–C–M/S, 1997 WL 148567 (S.D.Ind.1997), the non-resident defendant had extensive communications with the plaintiff in the forum state, including 80 electronic mail transmissions. There, the court found sufficient contacts to confer jurisdiction.

In this case, there is no evidence that any user in Connecticut accessed Neogen's Web site or purchased products based upon the Web site advertisement. There is also no evidence that this Web site advertisement was directed at Connecticut anymore than anyplace else in the nation. *See E–Data Corp., supra,* 989 F.Supp. at 177. Internet users could not order products directly from the Web site. Rather, it required them to call an "800" number in Michigan or write Neogen in Michigan or Kentucky. Like the court in *Hearst,* we find this Web site to be similar to an advertisement in a national magazine or newspaper.

The cases cited by plaintiffs are distinguishable on their facts. Plaintiffs rely on *Inset Systems, Inc., supra,* a trademark infringement case, in which the plaintiff complained that defendant's Internet domain address through which it advertised its goods and products infringed on its registered trademark. In that case, however, the Internet site itself was the source of the tortious conduct, *i.e.,* the alleged infringement. Likewise, *Forschner Group, Inc. v. New Trends, Vrolixs J.–C.,* No. B–89–531(JAC), 1994 WL 708129 (D.Conn. Aug.10, 1994), is distinguishable. There, the defendant advertised its products through a company in Connecticut and the advertisement constituted trademark infringement in Connecticut. No such facts are alleged in the instant case.

As the Ninth Circuit recently noted, "no court has ever held that an Internet advertisement alone is sufficient to subject a party to jurisdiction in another state.... In each case where personal jurisdiction was exercised, there has been 'something more' to 'indicate that the defendant purposefully, (albeit electronically), directed his activity in a substantial way to the forum state.'" *Panavision International, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir.1998) (citing *Cybersell, Inc., supra*, 130 F.3d at 418). If jurisdiction were be based upon a defendant's mere presence on the Internet, this would lead to a defendant's being subjected to jurisdiction on a worldwide basis and would eviscerate the personal jurisdiction requirements as they currently exist. *McDonough v. Fallon McElligott, Inc.*, No. Civ. 95–4037, 1996 WL 753991 (S.D.Cal.1996). This we decline to do. Thus, we hold that the minimum contacts requirements of the Due Process Clause are not met by virtue of defendant's maintenance of a Web site on the Internet.

### Conclusion

For the foregoing reasons, we GRANT defendant's Motion to Dismiss [**Doc. # 17**] and DENY defendant's Motion to Transfer [**Doc. # 17**]. Likewise, we DENY plaintiff's Motion to Transfer this case to Judge Arterton [**Doc. # 16**].

SO ORDERED.