Anthony ADAMS, Plaintiff,

v.

**GUTHY RENKER CORPORATION, Guthy Renker Television Network, Inc. and Time Warner Entertainment Company, L.P., Defendants.**

**No. 3:98–CV–1045(EBB).**

United States District Court,
D. Connecticut.

July 21, 2000.

Anthony W. Adams, Trumbull, CT, pro se.

Berthold H. Hoeniger, Bridgewater, CT, for Anthony W. Adams.

Daniel Schwartz, Sarah Moore Fass, Day, Berry & Howard, Stamford, CT, Felix J. Springer, Day, Berry & Howard, Hartford, CT, for Time Warner Entertainment Co., Inc.

Richard E. Castiglioni, James Patrick Blanchfield, Diserio, Martin, O'Connor & Castiglioni, Stamford, CT, for Guthy-Renker Corp.

## RULING ON MOTION FOR SUMMARY JUDGMENT

ELLEN B. BURNS, Senior District Judge.

### INTRODUCTION

Plaintiff Anthony Adams ("Plaintiff" or "Adams"), has filed an Amended Complaint, as ordered by this Court, to set forth the basis for his claim of personal jurisdiction over Guthy Renker Corporation ("GRC"), and Guthy Renker Television Network, Inc. ("GRT"). The Amended Complaint is in four counts, three against his former employer, Time Warner Entertainment ("TWE") and the fourth against GRC and GRT for tortious interference with Plaintiff's employment agreement with TWE and for conspiracy with Plaintiff's former supervisor in accomplishing his termination from TWE.

Defendants GRC and GRT now move to dismiss the Amended Complaint as to

them, asserting that no personal jurisdiction lies against them in this forum. Inasmuch as the parties submitted numerous affidavits and exhibits both in support of, and opposition to, the Motion, the Court, *sua sponte* and upon notice, converted the Motion to Dismiss into a Motion for Summary Judgment. The parties, accordingly, submitted timely Local Rule 9(c) Statements.

## STATEMENT OF FACTS

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, this Motion. The facts are culled from the Amended Complaint, the Local Rule 9(c) Statements and all exhibits filed therewith.

The context of this action is the "infomercial" industry, also known as "direct response television." Infomercials are typically thirty minute commercials for products, usually run during the late night and/or early morning hours, in which it is usual that a well-known personality from the world of entertainment or sports is the spokesperson. In 1993, Success Magazine reported that infomercials had become a $4.5 billion industry.

GRC is one of the largest and most successful producers of infomercials, with current sales volume exceeding $350 million annually. The principals of GRC are William Guthy and Gregory Renker. The former president of GRC is one Michael Wex, who was dismissed as a defendant in this case, the Court (Eginton, J.), finding that no personal jurisdiction existed as to Wex.

GRC markets and sells nationwide, including Connecticut. Laurel Cablevision, the Litchfield cable network, was owned by TWE and serviced approximately 25,000 subscribers. Such carriage of infomercials in Connecticut was the result of a contract, executed at TWE's corporate headquarters in Stamford, Connecticut on or about January 19, 1995.[1] The contract was signed by one Fred Dressler, Senior Vice President of TWE. This contract was later modified to enlarge the service area of GRC's infomercials. GRT was thereafter incorporated and became a party to the contracts with TWE. The enlargement noted above included a $1 million payment in order that any cable system of TWE carry GRT's infomercials.

At the pertinent time, TWE owned TCI Cablevision, which system covered New Haven and Hartford and had a total of 270,000 subscribers. During the months of April, May, and June 1997, fifty-nine subscribers of Laurel Cablevision contacted GRT, with sales totaling $7,747.95. Defendants failed and refused to turn over numbers during the pendency of this suit, as they also refused for TCI. The logical inference may be made, however, that, due to the subscription size of TCI, the sales to that area had to have been significantly larger.[2]

Prior to June 4, 1996, Michael Wex, acting as agent for GRC and GRT, reported to TWE's executives in Stamford, Connecticut that Adams had solicited a bribe from him, in order that Adams continue to "push for" the TWE/GRC/GRT infomercial contract, rather than any other infomercial company. When asked to explain his actions, Adams vehemently denied the allegation and, in complete contrast to the claim of Wex, reported that the offer of the bribe came from Wex to Adams, and that Adams had immediately rejected same. In a meeting with one Kevin Leddy, an executive with TWE, and one Nancy Locke, a personnel officer with TWE, Wex's charge was announced to Adams.

---

1. The Court does not find Defendants' claims that they never entered into any contract in Connecticut for business to be performed in Connecticut to be credible.

2. GRTV paid an annual fee in the amount of $49,968 to TWE for the ability to run its infomercials on TCI. Surely, if this were to be a profitable business, the sales from TCI simply had to be larger than this figure.

Adams insisted that the statement was false and that Wex knew it was false. Adams then told his side of the story to Leddy and Locke, who said that they would investigate the matter in order to ascertain who was telling the truth.

On June 5, 1996, Plaintiff was terminated for failure to immediately report the Wex bribe offer to TWE. This litigation followed and, in a decision rendered by Judge Eginton on June 28, 1999, it was held that there existed no personal jurisdiction over Wex individually. Plaintiff was given the opportunity to amend his Complaint in order to specify the facts upon which he believed that personal jurisdiction existed as to GRC and GRTV. An Amended Complaint was filed on July 19, 1996, and pleaded that personal jurisdiction existed over GRC and GRTV for two reasons: first, these Defendants were transacting business in Connecticut in violation of Conn.Gen.Stat. Section 33–920, having failed to obtain a certificate of authority to do so, as required by that statute; and, second, the cause of action against these Defendants arose from or had a nexus with the tortious inference claim and/or Defendants' contacts with the State of Connecticut.

## LEGAL ANALYSIS

### I. The Standard of Review

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). *See also Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548. *Accord, Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995) (movant's burden satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party...." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). If the nonmoving party submits evidence which is "merely colorable", or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 247–48, 106 S.Ct. 2505 (emphasis in original).

### II. The Standard As Applied

■ This case presents a question of personal jurisdiction over two foreign cor-

porations in a diversity suit. "[T]he amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits...." *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir.1963) (en banc); *accord Hoffritz For Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir.1985).

> Connecticut utilizes a familiar two-step analysis to determine if a court has ·personal jurisdiction. First, the court must determine if the state's long-arm statute reaches the foreign corporation. Second, if the statute does reach the corporation, then the court must decide whether that exercise of jurisdiction offends due process.

*Bensmiller v. E.I. Dupont de Nemours & Co.*, 47 F.3d 79, 81 (2d Cir.1995), *citing Greene v. Sha–Na–Na*, 637 F.Supp. 591, 595 (D.Conn.1986). *Accord Knipple v. Viking Communications, Ltd.*, 236 Conn. 602, 606, 674 A.2d 426 (1996); *Frazer v. McGowan*, 198 Conn. 243, 502 A.2d 905 (1986); *Lombard Bros., Inc. v. General Asset Management Co.*, 190 Conn. 245, 250, 460 A.2d 481 (1983); *see also Teleco Oilfield Services, Inc. v. Skandia Ins. Co.*, 656 F.Supp. 753, 756 (D.Conn.1987). A trial court need not make the second of these inquiries if it finds that the pertinent section of the long-arm statute does not reach the defendant foreign corporation. *Frazer*, 198 Conn. at 246–47, 502 A.2d 905.

The provision of the long-arm statute at issue in the present case is subsection (f)(4) of Conn.Gen.Stat. Sec. 33–929. That section provides:

> (f) Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state ... on any cause of action arising as follows:
> (4) out of tortious conduct in this state, whether arising out of repeated activity

or single acts, and whether arising out of misfeasance or nonfeasance.

■ In the present case, Plaintiff alleges that the false report that he attempted to bribe Michael Wex consisted of the tort of interference with his employment contract with TWE, in that he was terminated as a result of Wex's false report. False representations entering Connecticut by way of wire or mail constitute tortious conduct in Connecticut under Section 33–411(c)(4).[3] *Knipple*, 236 Conn. at 610, 674 A.2d 426, *citing Coan v. Bell Atlantic Systems Leasing International*, 813 F.Supp. 929, 944–45 (D.Conn.1990). *Accord David v. Weitzman*, 677 F.Supp. 95, 98 (D.Conn. 1987); *Teleco Oilfield Services, Inc. v. Skandia Insurance Co.*, 656 F.Supp. (D.Conn.1987). Communications by telephone or in person would also suffice to trigger jurisdiction under this statute. *Knipple*, 236 Conn. at 611, 674 A.2d 426. Thus, the first factor of Section 33–929 is met.

■ The second factor—did Plaintiff's termination "arise from" this conduct—is also answered in the affirmative. Section 33–929 does not require a causal connection between the defendant's forum-directed activities and the plaintiff's lawsuit, nor is the test one of "but for" or "proximate cause". *Thomason v. Chemical Bank*, 234 Conn. 281, 290–92, 661 A.2d 595. Rather, our legislature chose to enact, and reenact, a detailed statute spelling out the category of cases out of which the cause of action had to "arise" before long-arm jurisdiction could be exercised. *Id.* at 294, 661 A.2d 595. In conclusion, the *Thomason* Court held that the "arising out of" language meant that, at the time the defendant engaged in solicitation in Connecticut, it was reasonably foreseeable that, as a result of this solicitation, the defendant could be sued in Connecticut by a solicited person on a cause of action similar to that now being brought by Plaintiff. Patently, one

---

**3.** Conn.Gen.Stat. Sec. 33–929 became effective January 1, 1997. At the same time, Connecticut's former long-arm statute governing service on foreign corporations, Conn.Gen.

Stat. Sec. 33–411, was repealed. As the relevant language of these two statutes is identical, the Court will rely on case law interpreting former Conn.Gen.Stat. Sec. 33–411(c).

who is solicited with a bribe concerning the various parties to be able to contract for infomercials, while GRC and GRT widely solicit business in the state through its infomercials, could bring an identical cause of action as the Plaintiff herein is doing. *Id.* at 296, 661 A.2d 595. Thus, jurisdiction lies under Connecticut's long-arm statute.

The Court next turns to a due process analysis in order to determine whether Defendants constitutionally may be haled before a Connecticut court. Again, the answer is in the affirmative.

■ It is a basic principle of due process and federalism that a state may not "make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relation." *International Shoe Co. v. Washington,* 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The requisite "minimum contacts" necessary to subject a defendant to suit are not determined through a mechanical or quantitative evaluation of defendant's activities in the forum, but rather through a qualitative examination of the relationship among the defendant, the forum and the litigation. *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

■ This evaluation centers on the question of whether the defendant "purposefully avails itself of the privilege of conducting activities within the forum state...." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). A corporate actor need not have a physical presence in a state to establish the necessary minimum contacts, so long as the actor's efforts are "purposefully directed" towards the state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The key question, however, remains whether "the defendant's conduct and connections with the forum state are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

■ In the present case, TWE entered into several contracts with GRC and/or GRT for the showing of the latters' infomercials on both Laurel Cablevision networks and those of TCI, covering the New Haven and Hartford areas. TCI is one of the largest cablevision companies in the country, with 246,000 subscribers in the New Haven and Hartford areas alone.

GRC is one of the largest purveyors of materials purchased through its infomercials, its commercials, its "continuity" programs (which follow a sale by an offer to ship future installments to a customer and debit his or her credit card), telemarketing, marketing on home shopping networks such as QVC, direct mail and placement in retail chains, and through an "internet mall", operated by GRC's Online Division.

All or substantially all of the foregoing marketing and selling methods, including its internet mall, were employed by GRC in Connecticut to sell goods and services to residents of Connecticut. GRC contracted with TCI for carriage of GRC infomercials on TCI cable systems, for three hours a day, 365 days a week. GRC and/or CGT entered into contracts with Time Warner Cable ("TWC") for carriage of all of their offerings, goods and services with both Laurel and TCI cablevisions.

In April, May and June of 1997, GRC infomercials and commercials carried by Laurel Cablevision produced 59 responses from Connecticut residents. As noted earlier in this Ruling, although Defendants failed and refused to turn over the sales numbers for TCI, an extrapolation of the size of TCI vis a vis Laurel Cablevision (10% of the number of TCI customers), leads the Court to believe that the orders and revenue received from the TCI network was a comparatively large number and concomitant revenue.

The minimum contacts and "purposefully availing" inquiry may obviously be found in this case. Such purposeful conduct provided the Defendants with "fair warning" that they and their property may be subject to the forum state's power. *Burger*

*King,* 471 U.S. at 472, 105 S.Ct. 2174. A defendant may, accordingly, structure its primary conduct with some minimum assurance as to where that conduct will or will not render them to suit. *World–Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559. Here, the corporate defendants had significantly more than the minimum contacts required to give GRC and GRT notice that it would comport with due process to hale them into a Connecticut court. The infomercials and all of the other selling products used by GRC and GRT in Connecticut were "purposefully directed" to citizens of this forum. Accordingly, it would not offend the Due Process Clause to maintain jurisdiction over these moving Defendants.

### CONCLUSION

In the present case, the moving parties have failed to establish that there exist genuine issues of material fact as to jurisdiction over them. Resultingly, Defendants' Motion to Dismiss, converted to a Motion for Summary Judgment, [Doc. No. 55] is hereby DENIED.

SO ORDERED.